**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NICHOLAS GALLUP,**

                            **Plaintiff,**                     **6:11-CV-1345 (NAM)**

     **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

                            **Defendant.**
_____

**APPEARANCES:**

Louise M. Tarantino, Esq.
Empire Justice Center
119 Washington Avenue
Albany, New York 12210
For Plaintiff

Hon. Richard S. Hartunian, United States Attorney
Benil Abraham, Esq., Special Assistant United States Attorney
Social Security Administration
Office of Regional General Counsel, Region II
26 Federal Plaza - Room 3904
New York, New York 10278

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

**MEMORANDUM DECISION AND ORDER**

**I.     INTRODUCTION**

      Plaintiff Nicholas Gallup filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

and asks the Court to reverse the Commissioner's decision to deny his application for disability

benefits and remand this matter for payment of benefits. Presently before the Court are the

parties' cross-motions for judgment on the pleadings. Dkt. Nos. 14, 16.

**II.    BACKGROUND**

Plaintiff was born on June 26, 1988. He left high school in ninth grade and reads at a fourth or fifth grade level. He worked for Walmart as a "cart pusher" until he was fired in June 2009. T.39.

On January 20, 2010, plaintiff applied for child's insurance benefits based on disability. At the same time, he filed an application for supplemental security income. In both applications, plaintiff alleged that he became disabled on June 8, 2009 and that he suffers, among other things, low back pain, depressive disorder, anxiety disorder, learning disorder, paranoid personality disorder and borderline intellectual functioning. On May 13, 2011, after obtaining plaintiff's medical records and holding a hearing, Administrative Law Judge ("ALJ") Arthur Patane issued a decision finding that plaintiff "was not disabled as defined in section 223(d) of the Social Security Act prior to June 25, 2010, the date he attained age 22." T.28. On September 17, 2011, the Appeals Council denied plaintiff's request for review and the ALJ's decision became the Commissioner's final decision. T.1-6. This action followed.

### III.    Administrative Hearing

On March 1, 2011, the ALJ conducted a hearing regarding plaintiff's application for disability benefits. T.34. Plaintiff testified that he was classified as emotionally disturbed and learning disabled in school and placed in a special education class. T.43. Plaintiff stated that he completed eighth grade, left school when he was in ninth grade and has been unable to obtain his GED. T.43. Plaintiff described his ability to add and subtract as "bad" and his ability to spell as "very bad". T.44. Plaintiff stated that he could not "read that well at all" and that he would "have people read stuff to [him] and then most of the time [he will] understand some of it." T.44.

Plaintiff stated that he last worked in June 2009, as a "cart pusher" for Walmart. T.38. He

testified that he was terminated "due to absence and tardiness, because [he] had severe problems with quite a few other workers that I was working with to the point where [he] had severe anger issues and [he] would fly off the wall at them. I mean, I screamed and yelled at management." T.39.

Plaintiff testified that he lives in an apartment with one roommate. T.38. Plaintiff stated that he has a driver's license and a vehicle. T.41-42.

Plaintiff testified that during the day, he "normally" goes to his aunt's residence, where he visits with her, watches television and eats all his meals. T.41. Plaintiff stated that he then goes back home and goes to sleep. T.41.

Plaintiff stated that when he is at home, he uses his computer to "[p]lay numerous games" and talk to friends who live "out of town." T.42. Plaintiff testified that "[s]ometimes" he cleans his apartment. T.41. Plaintiff stated that he gets "sidetracked" "everyday with the simplest tasks" and explained that when he tries to clean his house, he will start in his bedroom, "jump to the living room, then jump to the kitchen and . . . all over the place." T.45.

Plaintiff stated that the pain level in his back is an eight "on most days" but when it is severe, "it's a ten". T.50. Plaintiff testified that he "toss[es] and turn[s] almost all night, trying to get comfortable because the pain is going all the way up [his] back." T.50. Plaintiff stated that the pain is "constant" and that if he stands for too long, i.e., thirty minutes, "it hurts and it'll go up my neck and it'll go down to my legs." T.50. Plaintiff testified that sitting "normally" causes back pain, but that if he moves around, "then for the most part [he is] okay" and "can go back to sitting again." T.51. Plaintiff stated that he can sit "[m]aybe about an hour" before he needs to stand up and move around. T.51.

Plaintiff testified that his doctor prescribed Lortab for his back until his "ex-fiance" began stealing it. T.55. Plaintiff stated that he also received a prescription for a muscle relaxant. T. 59. Plaintiff testified that he takes "Ibuprofen and Aleve and Advil" for back pain. T.59. Plaintiff testified that he also takes Cymbalta and Pepcid. T.43.

Plaintiff stated that his memory is "very bad" and that he forgets "appointments, names, numbers" and medication, which his roommate reminds him to take. T.45. Plaintiff testified that his poor memory affects his driving and he forgets where he is going. T.44.

Plaintiff stated that he has no social habits and that he feels "paranoid to leave the house" because he feels "that everyone is looking at me or everyone is talking about me and it's really scary." T.47. Plaintiff testified that he goes grocery shopping at "12:00 or 1:00 in the morning" when "the store is completely empty and if it's not empty, there's only a few people in there." T.47.

Plaintiff testified that he has nightmares two to three times a week and that he has problems with suicidal thoughts "three or four times a week." T.47. Plaintiff testified that after his uncle died, he heard him "talk to him almost every night" and on numerous occasions, he has heard people calling his name when "there's nobody there." T.48. Plaintiff stated that he has severe mood swings, "like one minute I could be talking really calm to somebody and the next minute I'm screaming and yelling at people." T.48. Plaintiff stated that he recently had an altercation with a customer service manager at a retail store who "was doing her job" and he "started flipping and screaming at her along with other store managers". T48. Plaintiff testified that he has had fifteen or twenty angry outbursts since then. T.49.

IV.    **ALJ's Decision**

4

To be eligible for Social Security disability benefits, a claimant must establish "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

On May 13, 2011, using the five-step evaluation process, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Social Security Act. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 8, 2009, the alleged onset date of his disability. T.23. At step two, the ALJ found that plaintiff suffered from the following severe impairments: "low back pain, depressive disorder, anxiety disorder, learning disorder, alcohol use and dependence,[1] paranoid personality disorder, and borderline intellectual functioning". T.23.

At step three, the ALJ found that plaintiff "does not have an impairment or combination of

_____

[1]There is no evidence that plaintiff has any substance abuse issues, but the error is harmless since the ALJ does not mention of "alcohol use and dependence" anywhere else in the decision.

impairments that meets or medically equals one of the listed impairments in 20 CFR 404, Subpart

P, Appendix 1 (20 CFR 404.1520(d), 404.1525 , 404.920(d), 416.925, and 416.926).” T.24. The

ALJ also considered plaintiff’s mental impairments at step three and found that he: “has mild

limitation in activities of daily living, moderate difficulty in maintaining social functioning, and

moderate difficulty in maintaining concentration, persistence, and pace, with one or two episodes

of decompensation of extended duration.” T.24.

At step four, the ALJ found that plaintiff “has the residual functional capacity to perform

medium work as defined in 20 CFR 404.1567 and 416.967(c) provided that it is a low contact

setting and involves simple rather than complex instructions and tasks.” T.24.

At step five, the ALJ found that plaintiff could not perform his past relevant work, that he

is “a younger individual” as defined by the regulations, “has at least a high school education”, and

concluded that considering these factors as well as his work experience, “there are jobs that exist

in significant numbers in the national economy that” he could perform. T.27. Because the ALJ

found that plaintiff could “perform all or substantially all of the exertional demands” of medium

work, and that plaintiff’s “additional limitations have no significant effect on the occupational

base of unskilled medium work,” he utilized the Medical-Vocational Guidelines, 20 C.F.R. Part

404, Subpart P, Appendix 2 (the “Grids”) “as a framework for decisionmaking” and concluded

that plaintiff was not disabled. T.27-28.

## V.      DISCUSSION

Plaintiff argues that: (1) the ALJ erred at step two by failing to include post traumatic

stress disorder as a severe disorder; (2) the ALJ failed to give proper weight to his treating

sources, Frances LoCascio, a psychiatric nurse practitioner, and Dr. Vacek, a primary care

physician; (3) the ALJ's reliance on the Grids was improper because his mental health impairments and limitations in reading and writing significantly eroded his ability to perform the full range of medium work; and (4) the ALJ erred when finding that plaintiff's allegations were not credible.

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether plaintiff is disabled. Rather, the Court must examine the Administrative Transcript to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Shaw v. Chater*, 221 F.3d 126 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### A. Mental Impairments

Plaintiff contends that the ALJ erred when evaluating his mental impairments. Plaintiff argues that: (1) the ALJ omitted plaintiff's PTSD diagnosis from his evaluation of the severity of his mental impairments at step two; (2) the ALJ failed to apply the proper legal standards in evaluating the impact of his mental impairments on his residual functional capacity; (3) that the ALJ erred when he declined to accord great weight to the opinion of the nurse practitioner who treated his anxiety and depression; and (4) that the ALJ should have consulted a vocational expert to determine whether there was work he could perform despite his nonexertional mental impairments.

The record contains the following evidence regarding plaintiff's mental impairments:

treatment notes and a "Mental Residual Functional Capacity Assessment" from Frances

LoCascio, the psychiatric nurse practitioner who treated plaintiff for anxiety and depression at

The Family Counseling Center,[2] T. 286, 408, 428, 430, psychiatric and intelligence evaluations by

consultative examiner Kerry Brand, Ph.D. T.294, and a "Psychiatric Review Technique" and

"Mental Residual Functional Capacity Assessment" by state agency reviewing psychologist, L.

Hoffman T.372, 393.

In addition to the five-step analysis outlined above, the regulations governing evaluation

of the severity of mental impairments, 20 C.F.R. § 404.1520a, require "application of a 'special

technique' at the second and third steps of the five-step framework". *Kohler v. Astrue*, 546 F.3d

260, 266 (2d Cir. 2008) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 844 n.4 (7th Cir. 2007)). "This

technique 'requires the [ALJ] to determine first whether the claimant has a medically

determinable mental impairment.'" *Petrie v. Astrue*, 412 F. App'x 401, 408 (2d Cir. 2011)

(quoting *Kholer*, 546 F.3d at 265-66) (additional quotation marks omitted). The ALJ "must then

rate the degree of functional limitation resulting from the impairment(s)", 20 C.F.R. §

404.1520a(b)(2), in four areas: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence or pace; and (4) episodes of decompensation. *Id*. § 404.1520a(c)(3).

The ALJ must rate the first three areas on a scale of: "[n]one, mild, moderate, marked, and

extreme," and the fourth area on a scale of: "[n]one, one or two, three, four or more." *Id*. at §

404.1520a(c)(4).

If the ALJ rates the degree of limitation in each of the first three areas as "mild" or better

and identifies no episodes of decompensation, the ALJ "will generally conclude" that the

---

[2]Plaintiff was also seen by Diane Palma, MS, at least once on January 12, 2010. T.231.

plaintiff's impairment is "not severe" and deny benefits. *Id*. at § 404.1520a(d)(1). If, however, the plaintiff's mental impairment is "severe", the ALJ must "determine if it meets or is equivalent in severity to a listed mental disorder." *Id*. at § 404.1520a(d)(2). "If yes, then the [plaintiff] is 'disabled.'" *Petrie*, 412 F. App'x at 408 (quoting 20 C.F.R. § 404.1520a(d)(2)). If it does not meet or equal a listing, the ALJ "will then assess [the plaintiff's] residual functional capacity." 20 C.F.R. § 404.1520a(d)(3).

The regulations require the ALJ to document the application of the special technique and the ALJ's written decision must therefore: "reflect application of the technique and . . . 'include a specific finding as to the degree of limitation in each of the [four] functional areas.'" *Kohler*, 546 F.3d at 266 (quoting 20 C.F.R. § 404.1520a(e)). "Generally, a medical or psychological consultant will complete a standard document known as a 'Psychiatric Review Technique Form'". *Petrie*, 412 F. App'x at 408.

In this case, the ALJ relied on the psychiatric review technique completed by state agency reviewing psychologist, L. Hoffman, who reviewed the medical records and concluded that plaintiff had: a depressive disorder, borderline intellectual functioning, a learning disorder, an anxiety disorder, post traumatic stress disorder ("PTSD"), social anxiety disorder, and dependent personality disorder. T.372-81. Hoffman found that these mental impairments caused a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence or pace and one or two episodes of deterioration. T.382-83. The ALJ adopted Hoffman's findings regarding the four functional areas but did not include plaintiff's diagnosis of PTSD when recounting plaintiff's diagnoses.

Plaintiff was diagnosed with PTSD by LoCascio, the psychiatric nurse practitioner who

treated him from March 2010 to March 2011. T.286, 444. Hoffman noted the PTSD diagnosis, along with the diagnoses "anxiety disorder N[ot] O[therwise] S[pecified]" and "social anxiety disorder", in the section entitled "Anxiety Related Disorders". T. 377. In his decision, the ALJ did not identify the individual diagnoses but referred to them generally as an "anxiety disorder". T.23. Since the ALJ found, at step two, that plaintiff's anxiety disorder was severe, he, as discussed below, considered the impact of this disorder on plaintiff's RFC. Therefore, the ALJ's omission of the specific diagnosis was harmless. *See, e.g.*, *Malloy v. Astrue*, No. 3:10cv190, 2010 WL 7865083, at *16 (D. Conn. Nov. 17, 2010) (finding no error in the ALJ's failure to "recognize the correct diagnosis of Plaintiff's mental or emotional illness" and characterization of it as "depression" explaining that there was "nothing in the regulations that limits the ALJ's characterization of mental impairments to specific DSM–IV diagnoses" and that the characterization did not affect the ALJ's determination "as to the functional limitations cause by [the plaintiff's] mental impairment.").

If the ALJ concludes, at steps two and three, that a plaintiff's mental impairments are severe, the ALJ must consider the impact of those impairments on a plaintiff's residual functional capacity ("RFC").[3] This requires the ALJ to itemize and assess whether the plaintiff has

---

[3]Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling

limitations with respect to various functions contained in the regulations including the ability to: understand, remember and carry out instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work pressures in a work setting; and deal with changes in a routine work setting. SSR 96–8p, 1996 WL 374184 (S.S.A.); 20 C.F.R. § 416.920a; *see also White v. Comm'r of Soc. Sec.*, 7:05-cv-1013, 2008 WL 820177, at *8 (N.D.N.Y. Mar. 26, 2008); *see also Pabon v. Barnhart*, 273 F.Supp.2d 506, 516 (S.D.N.Y. 2003).

In this case, after weighing the evidence, the ALJ concluded that plaintiff's mental impairments limited the work he could perform to "simple" work in "a low contact setting". T.27. In reaching this conclusion, the ALJ gave "great weight" to Hoffman's opinion but did not specify the weight, if any, he gave Dr. Brand's opinion and declined "to grant great weight" to LoCascio's opinion because as a nurse practitioner, she was not an "accepted medical source" and her opinion was inconsistent with the other evidence. T.26. Plaintiff argues that the ALJ should have accorded controlling weight to LoCascio's opinion and that the mental RFC determination is not supported by substantial evidence.

The ALJ briefly referred to LoCascio in his decision, but did not discuss her treatment notes or opinion, stating only that he: "decline[d] to grant great weight to [her] opinion" because she was "not an accepted medical source" and her "opinion regarding the nature and severity of the claimant's mental limitations is directly contradicted by the accepted medical sources of

---

Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)). In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a).

record". T.26. While the ALJ was not required to accord LoCascio's opinion the controlling weight generally accorded that of a treating physician because she was not an "acceptable medical source" as defined by the regulations. *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) ("Acceptable medical sources" are . . . defined (by regulation) as licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists) (citing 20 C.F.R. § 416.913(a)), he should have given LoCascio's opinion some consideration as she was the only medical professional to treat plaintiff's mental condition during the relevant time period. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir.1983) (stating opinion of nurse practitioner who treated claimant on regular basis entitled to "some extra consideration"). Moreover, the record does not support the ALJ's conclusory finding that LoCascio's opinion was contradicted by the acceptable medical sources: Dr. Brand and L. Hoffman, or the ALJ's finding that, at most, plaintiff's mental impairments limited him to "simple" work in a "low contact setting".

From March 2010 to March 2011, Locascio treated plaintiff for anxiety and depression. LoCascio prescribed various medications for his depression and anxiety and also to help him sleep. In August 2010, LoCascio completed a mental residual functional capacity assessment and opined that plaintiff was "moderately limited" in his ability to: "remember locations and work-like procedures"; "make simple work-related decisions"; "ask simple questions"; and to understand, remember and carry out "very short and simple instructions" . T.408, 409. LoCascio further opined that plaintiff was "markedly limited" in his ability to, among other things: understand, remember and carry out "detailed instructions"; "maintain attention and concentration"; "perform activities within a schedule"; "work in coordination with or proximity

12

to others without being distracted by them"; "perform at a consistent pace"; "complete a normal workday and workweek without psychologically based symptoms"; "interact with the public"; "accept instructions and respond appropriately to criticism from supervisors"; get along with coworkers; and "respond appropriately to changes in the work setting". T.409.

When consultative psychologist, Kerry Brand, Ph.D, performed a mental status examination, he found that plaintiff was cooperative, his manner of relating was "adequate", his hygiene and grooming were "good", his eye contact "was appropriate", and his thought processes were "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia". T. 296. Dr. Brand found plaintiff's attention and concentration to be "[m]ildly impaired" and his "recent and remote memory skills" to be "[m]ildly impaired". As a result, Dr. Brand opined that plaintiff "may have moderate difficulty": "maintaining attention and concentration", "maintaining a regular schedule", "learning new tasks and performing complex tasks independently", "making appropriate decisions, relating adequately with others, and dealing appropriately with stress." T.297.

Dr. Brand also conducted an "Intelligence Evaluation". Plaintiff's test[4] results indicated that plaintiff's reading and decoding skills were at the fifth grade level and that he had a "full scale IQ of 72". T.301. Dr. Brand noted that "[o]verall", plaintiff was "functioning in the borderline range of intelligence." T.301.

Hoffman, the psychologist who reviewed plaintiff's records at the Commissioner's request opined that plaintiff was "Moderately Limited" in his ability to: understand, remember and carry

---

[4]Dr. Brand administered the Wide Range Achievement Test, Third Edition and the Wechsler Adult Intelligence Scale, Fourth Edition. T.301

13

out detailed instructions; "maintain attention and concentration for extended periods"; "make simple work-related decisions"; "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; "to accept instructions and respond appropriately to criticism from supervisors"; and "get along with coworkers without distracting them or exhibiting behavioral extremes" T. 393-94. Hoffman recommended that: "Given reports and history that the claimant may have difficulties relating with others and/or adapting to changes, a low contact setting may be beneficial." T.395.

Notwithstanding the evidence that plaintiff had at least moderate limitations with regard to handling detailed instructions, maintaining attention and concentration, making simple decisions, completing a normal workday without interruptions, responding to input from supervisors, and dealing with stress in the workplace, the ALJ found that plaintiff's mental impairments impaired his RFC only to the extent that he required a "low contact setting" and work that "involves simple rather than complex instructions and tasks." T. 24. The ALJ did not account for plaintiff's "borderline intellectual functioning", even though he found at step two that plaintiff's "learning disorder" was severe. T.23. Thus, the ALJ's RFC determination with respect to plaintiff's mental limitations is not supported by substantial evidence; it contains conclusory findings regarding his limitations and fails to acknowledge the other areas of limitation identified by the treating, examining and consultative sources. *See Martone v. Apfel*, 70 F.Supp.2d 145, 150 (N.D.N.Y.1999) ("In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient.") (citations omitted)).

**B.     Treating Physician**

Plaintiff argues that the ALJ should have given controlling weight to the opinion of his treating physician, James Vacek, M.D., whose "Physical Capacity Evaluation" indicates that plaintiff could sit for two hours and stand for one hour in an eight-hour workday and could not lift more than ten pounds. T.410. In determining that plaintiff had the RFC to perform medium work, the ALJ did not give any weight to Dr. Vacek's opinion, finding that it was "merely a recounting of the claimant's own allegations", T.25, and instead relied of the opinion of Amelita Balagtas, M.D., who performed a consultative orthopedic examination. T.25, 291. "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

According to the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citations and quotation marks omitted). "Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, ... the opinion of the treating physician is not afforded controlling weight where ... the treating physician issued opinions that are not consistent with other substantial evidence in the record[.]" *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Where the ALJ finds that a treating physician's opinion is not deserving of controlling weight, the ALJ may still give it "extra weight" after considering specific factors. *See* C.F.R. § 404.1527(d)(l)-(6); *Shaw*, 221 F.3d at134.

When the ALJ does not give the treating source's opinion controlling weight, the

Regulations require that the ALJ apply the following factors in determining the weight to give the opinion:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.

*Abreu v. Astrue*, No. 11 Civ. 3719, 2012 WL 4714892, at *4 (S.D.N.Y. Sept. 27, 2012); s*ee* 20 C.F.R. § 404.1527(d)(2).

In discussing the medical evidence, the ALJ stated that he did "not grant any significant weight to the October 2010 physical capacities evaluation of record as it is not a medical opinion but merely a recounting of the claimant's own allegations." T.25 (internal citation omitted). Indeed, throughout his physical capacity evaluation, Dr. Vacek noted that the exertional limitations were "per pt". T.410. The ALJ was not required to give the limitations identified in Dr. Vacek's evaluation because they were based on plaintiff's subjective complaints of pain, not "medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Baladi v. Barnhart*, 33 F.App'x 562, 564 (2d Cir. 2002) ("The treating physician's opinions were based upon plaintiff's subjective complaints of pain and unremarkable objective tests, and therefore the ALJ was not required to give that opinion controlling weight, as it was not well-supported by medically acceptable clinical and laboratory diagnostic techniques.") (internal quotation marks omitted)). Further, although Dr. Vacek was plaintiff's treating physician, only two of his progress notes refer to plaintiff's back pain.[5] T.223.

---

[5]Plaintiff saw a number of providers at The Nathan Littauer Primary Care Center, several of whom documented his back pain.

When plaintiff saw Dr. Vacek on July 26, 2007, he found mild tenderness in plaintiff's lower back but that his range of motion was "Ok" and the straight leg raising test was negative. T. 223. When plaintiff saw Dr. Vacek on August 31, 2007, he noted that plaintiff had a "back ache", and ordered an x-ray. T.266. Thus, the ALJ did not err when he declined to accord controlling weight to Dr. Vacek's opinion. In view of the obvious problem with the only physical capacity evaluation in the record from a treating physician, however, the ALJ should have re-contacted Dr. Vacek to ask him to provide his opinion regarding plaintiff's physical limitations. An ALJ "has an obligation to develop the record ... regardless of whether the claimant is represented by counsel ." *Shaw*, 221 F.3d at 131. Here, there is no indication that the ALJ re-contacted Dr. Vacek to request a medical assessment supported by medical findings regarding plaintiff's RFC. *Cf. Baladi*, 33 F. App'x at 564 (finding no error in ALJ's decision to discount the opinion of the plaintiff's treating physician, which was based on the plaintiff's subjective complaints, but noting that the ALJ attempted to remedy this issue and "fulfilled his obligation to fully develop the administrative record by requesting additional reports from the treating physician"). The absence of evidence regarding plaintiff's work-related capabilities from his treating physician, however, constitutes a gap in the administrative record and requires this Court to remand this matter for further proceedings. *See Toribio v. Astrue*, 06–CV–6532, 2009 WL 2366766, at *8 (E.D.N.Y. July 31, 2009) ("Gaps in the administrative record warrant remand for further development of the record.").

## C.     Consultative Examiner

Plaintiff claims that the ALJ erred in crediting Dr. Balagtas's opinion because Dr. Balagtas did not have his MRI results, which indicated herniated discs, when she issued her

opinion. T.291. An ALJ is entitled to rely upon the opinions of the state agency's medical and

psychological consultants, since they are qualified experts in the field of Social Security

disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6),

416.913(c), and 416.927(f)(2).

Plaintiff told Dr. Balagtas that he has had low back pain since the age of thirteen or

fourteen, and described it as a sharp, nonradiating pain that is aggravated by "prolonged walking,

sitting or standing". T.291. Dr. Balagtas noted that an x-ray report of "the lumbar spine was read

as no obvious acute focal abnormality seen by radiography." T.291. Dr. Balagtas found that

plaintiff "appeared to be in no acute distress", had a normal gait and station, could "walk on heels

and toes without difficulty", and could "do a deep squat". T.292. Dr. Balagtas found plaintiff had

full "flexion, extension, lateral flexion bilaterally, and rotary movements bilaterally." T.292.

There was no spinal, paraspinal or sciatic notch tenderness, no spasm and no "trigger points".

T.292. The straight leg raising test was normal bilaterally. T.292. Additionally, Dr. Balagtas

found that plaintiff had full range of motion in his hips, knees and ankles bilaterally and that his

strength was "5/5 in proximal and distal muscles bilaterally." T.292. Dr. Balagtas diagnosed

"Low back pain, by history" and stated: "Based on today's orthopedic evaluation, there is no

impairment on this claimant." T.292-93.

The MRI report, dated March 29, 2010, indicated disc herniations at L4-5 and L5-S1. The

MRI results do not necessarily undermine Dr. Balagtas's opinion because there was nothing

during the physical examination that suggested any degree of limitation.[6] The MRI, however,

_____

[6]Dr. Balagtas reported that plaintiff "appeared to be in no acute distress", his gait was
normal, he had "[f]ull flexion, extension, lateral flexion bilaterally, and rotary movements
bilaterally" of the cervical, thoracic and lumbar spine, fill range of motion of hips, knees and

provided objective medical evidence of plaintiff's back condition. Since the Court is remanding this matter to enable the ALJ to re-contact plaintiff's treating physician, the ALJ may wish to obtain a second consultative examination. *Id*. § 404.1512(e)(1) (the ALJ is authorized to direct a claimant "to attend one or more consultative examinations at our expense").

### D. Credibility

Plaintiff claims that the ALJ's explanation for his decision to discount plaintiff's complaints of a disabling condition was inadequate. When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence[.]" *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." *Casino-Ortiz v. Astrue*, No. 06 Civ. 0155, 2007 WL 2745704, at *11 n.21 (S.D.N.Y. Sept. 21, 2007) (citing 20 C.F.R. § 404.1529(c)(2)).

If the plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his pain is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent

---

ankles and his strength was "5/5 in proximal, and distal muscles bilaterally". T.292.

with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his back pain are consistent with the objective medical and other evidence. *See* SSR 96-7p, 1996 WL 374186, at *2; *see also Cloutier v. Apfel*, 70 F.Supp.2d 271, 278 (W.D.N.Y. 1999) (holding that although the ALJ's decision contained a discussion of the medical evidence and a summary of the plaintiff's subjective complaints, the decision did not provide a sufficient analysis of the evidence to support the lack of credibility finding).

When rejecting subjective complaints of pain, an ALJ must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief [.]" *Brandon v. Bowen*, 666 F.Supp. 604, 608 (S.D.N.Y. 1987). If the Commissioner's findings are supported by substantial evidence, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). A reviewing court's role is merely to determine whether substantial evidence supports the ALJ's decision to discount a claimant's subjective complaints. *Id.* (quotations and other citations omitted).

Plaintiff's principal objection is to the following portion of the ALJ's decision, which, he asserts, contains "boilerplate" language and shows the ALJ failed to engage in the required analysis:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statement's concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The ALJ, however, did not end the analysis there, he also noted the medical evidence,

including the x-ray results, "mild[7] findings on MRI" and Dr. Balagtas' report, that plaintiff did not rely on pain medication, T.25, and "activities of daily living", as reported to Dr. Brand, the consultative psychologist, including the ability to dress, bathe and groom himself, cook and prepare food, do general cleaning, do laundry, go grocery shopping, drive, get along well with friends, and use his computer" were "inconsistent with a degree of limitation." Thus, the ALJ considered the factors outlined in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi) and 416.929(c) (3)(i)-(vi), and adequately explained why he did not find plaintiff's complaints of disabling pain entirely credible.

### E.     Medical Vocational Guidelines

At the fifth step of the sequential evaluation of disability, the Commissioner bears the responsibility of proving that plaintiff is capable of performing other jobs existing in significant numbers in the national economy in light of plaintiff's residual functional capacity, age, education, and past relevant work. 20 C.F.R. §§ 416.920, 416.960. Ordinarily, the Commissioner meets this burden at this step "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  Sole reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's limitations. *Id*. at 606. For example, use of the grids as the exclusive framework for making a disability determination may be precluded where a plaintiff's physical limitations are combined with non-exertional impairments which further limit the range of work

---

[7]Plaintiff notes the ALJ's reference to the MRI results a "mild" and asserts that "[n]o medical professional characterized Mr. Gallup's multiple disc herniations as mild." Dkt. No. 14. The MRI report indicates two disc herniations as well as "[m]ild facet hypertrophy". T.414. The ALJ's statement is therefore not unfounded.

he can perform. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). In these circumstances, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." *Bapp*, 802 F.2d at 603; *see also Melchior v. Apfel*, 15 F. Supp.2d 215, 222 (N.D.N.Y. 1998) (stating "where nonexertional limitations significantly diminish the ability to perform a full range of work, it is appropriate that the ALJ present testimony from a vocational expert").

Here, the ALJ found that plaintiff was unable to perform past relevant work, was a younger individual, "has at least a high school education", could perform the full range of medium work, and that his "additional limitations have no significant effect on the occupational base of unskilled medium work." T.27-28. The ALJ therefore found, based on Medical-Vocational Rule 203.29 that a finding of "not disabled" was "appropriate under the framework of this rule." T.28.

As an initial matter, it is undisputed that the ALJ applied the wrong rule; plaintiff was not a high school graduate. This error was, however, harmless because Medical-Vocational Rule 203.26 accounts for a limited education and still directs a finding of not disabled. 20 C.F.R. Pt. 404, Subpt. P, App.2.

Plaintiff further argues that his psychiatric impairments, borderline intellectual functioning and limitations in reading and writing required the ALJ to obtain the testimony of a vocational expert and precluded him from relying on the Grids. The ALJ found that plaintiff could perform medium work but that any work setting must be "low contact" and that the work must involve "simple rather than complex instructions and tasks." T.24. Vocational expert testimony is required only if a claimant's "nonexertional limitations ... significantly limit the

22

range of work permitted by his exertional limitations." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (internal quotation marks omitted). A nonexertional impairment is "significantly limit[ing]" when it "so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 410–11. Here, the ALJ determined that the additional limitations "have no significant effect on the occupational base of unskilled medium work". Thus, the ALJ did not err in relying on the Grids to determine that jobs existed in the economy that plaintiff could perform. "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

## VI.     REMEDY

Sentence four of 42 U.S.C. § 405(g) proves that "[t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." The Second Circuit has stated that "where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate." *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) (citing *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999)). "On the other hand, 'where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits.'" *Id*. at 385-86 (quoting *Rosa*, 168 F.3d at 83).

Here, there is a gap in the administrative record: the absence of an opinion from plaintiff's treating physician. Additionally, given the extent of plaintiff's nonexertional mental impairments, which have never been considered by a vocational expert, the Court concludes that remand for further development of the record is required.

**VII.    CONCLUSION**

For these reasons, it is hereby

**ORDERED** that the Commissioner's motion for judgment on the pleadings (Dkt. No. 13) is **DENIED**; and it is further

**ORDERED** that plaintiff's motion for judgment on the pleadings (Dkt. No. 11) is **GRANTED**; and it is further

**ORDERED** that the Commissioner's decision is reversed and this matter is remanded for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment for the plaintiff and **Close this Case**.

**IT IS SO ORDERED.**

Date:   June 3, 2014

Norman A. Mordue
Senior U.S. District Judge